## Case No. 10,575.

### The ORION.

[4 Wkly. Law Gaz. 327.]

District Court, S. D. New York. Oct., 1859.

SLAVE TRADE—EVIDENCE TO SUPPORT CONDEMNATION.

[A decree condemning a vessel for being engaged in the slave trade is supported by evidence that she was captured at the mouth of the Congo river carrying less than a half cargo of miscellaneous goods apparently selected with a view to traffic in slaves, or to be used as provisions for them, which cargo was excessively and wrongly invoiced at New York where the vessel was chartered at an excessive rate, and where the entire crew was changed on the day of sailing, and that the claimant could give no adequate explanation for the use of the large quantity of water casks and coppers carried.]

[This was a libel of information filed against the bark Orion charged with being engaged in the slave trade.]

HALL, District Judge. The libel of information in the case alleges the seizure of the Orion, her tackle, apparel, furniture and lading, on the 21st April, 1856, on the high seas, on the western coast of Africa, near the mouth of the Congo river, by the United States sloop-of-war Marion, commander, Thomas W. Brent; that said bark was therefore, to wit, on the 20th day of January, 1859, equipped, loaded, or otherwise prepared by a citizen of the United States, at a port of New York, for the purpose of carrying on a trade or traffic, in slaves to some foreign kingdom, or for the purpose of procuring from some foreign kingdom, place or country, inhabitants thereof, to be transported to some foreign country, to be sold or disposed of as slaves, contrary to the act of congress, approved March 22, 1794 [1 Stat. 347], entitled "An act to pro-

---

[1] [Reported by F. E. Parker, Esq., assisted by Charles Francis Adams, Jr., Esq., and here reprinted by permission.]

hibit the carrying on of the slave-trade from the United States to any foreign place or country." The libel also makes similar allegations in regard to the vessel being fitted, equipped, loaded and prepared at New York, for the purpose of procuring negroes, mulattoes or persons of color from some foreign country, to be transported to some port or place to be held, sold, or otherwise disposed of as slaves, or to be held to service or labor contrary to the act of congress, approved April 30, 1818 [3 Stat. 450], and entitled "An act in addition to an act to prohibit the introduction (importation) of slaves into any port or place within the jurisdiction of the United States, from and after the first day of January, 1808, and to repeal certain parts of the same."

The bark is claimed by H. S. Vining, and the lading by J. DeMiranda, by the agent, T. P. Canhao, and the question in the case is whether the vessel was fitted out and prepared for the slave-trade in the port of New York, as alleged in the libel. This question depends in this case wholly upon circumstantial evidence. Indeed, it must in all cases of this kind depend, mainly upon that kind of testimony, unless the vessel has actually taken slaves on board. The bark is a vessel of about 450 tons burden, built in 1846. A charter party found among her papers, executed by Vining to Miranda, bearing date Jan. 6, 1859, shows that she was chartered for a voyage to the west coast of Africa and back to New York, for the sum of $850 per calendar month. A bill of lading found on board, dated 19th January, 1859, appears to show the shipment, by Miranda, of a miscellaneous or assorted cargo, consigned to Frisbad Pinto Canhao, and to be delivered at "Porta da Leubo and a market," and the goods, etc., so shipped are invoiced in an invoice signed by Miranda at $14,442.14, including commissions and charges. They were, however, appraised, by appraisers, agreed to by the parties and appointed by the court at $5,923.11. A very small portion of the provisions, etc., might have been consumed by the crew. This was a small cargo, the officer of the navy who searched her, and was sent home in her as one of the officers in charge after her seizure, stating that she had from one-third to one-half a cargo, and the manifest presented at the custom-house stating that a portion of the 163 casks on board were filled with sea water for ballast.

On the 20th of January, 1859, she was registered anew in the name of Vining as the sole owner, as on a change of owners—John E. Hannah being the master named in the register. On the same 20th January, 1859, the crew-list and manifest were sworn to at the custom-house by Hannah as master, the crew named being the same as appeared upon shipping articles by which the crew agreed to render themselves on board at 11 a. m. of that day. A copy of the ship-ping articles, which was certified by the collector on the same 20th January, 1859, is produced, annexed to which is a certificate of John Edwards, notary public, dated the same 20th January, 1859, certifying that twelve of such crew (being the whole crew, with the exception of the mate) left the Orion at the port of New York during the interlapse of clearing and sailing, and that twelve others were shipped in their stead. Ten of these last named twelve seem to have signed the shipping articles by their marks, and opposite to the names of the three others signed to the same articles is entered the word "deserted." The bark, though a small vessel, had two decks—the spar deck and a half between deck—a second deck commencing aft and coming forward to the main hatch, and another commencing forward and running back to the forecastle hatch, while between these half decks there are beams running across the vessel three or four feet apart, on which plank could be laid to complete this deck, throughout the vessel. On these half decks no cargo was stowed.

In the vessel, invoiced and manifested as part of the cargo, was found about 17,000 feet of lumber, which could have been used to complete the deck; 163 casks, most of them apparently intended for water-casks, and averaging over 130 gallons each, and invoiced at 34,540 gallons; 150 buckets, without handles; 200 barrels navy bread; 46 tierces containing about 29,000 pounds of inferior rice; 12 cases containing 240 muskets; about 300 feet in length of hoop iron, not on manifest or bill of lading, not in the invoice; a large quantity of medicines, consisting of Epsom salts, cantharides plaster, simple cereate, and powdered mustard. Also, a half barrel of flax-seed, a quantity of fire-wood, and about a ton of coal, two copper boilers, or stills, holding some 60 gallons each, a quantity of beef, pork, and beans, and about 100 bottles of disinfecting fluid, or chloride of soda in solution. Besides these, the cargo was made up principally of cheap shirtings and sheetings, cheap stripes and drills, cheap prints, cotton handkerchiefs, very cheap earthenware, including large quantities of bowls and soup plates, 24,000 gallons of rum, over 50 dozen of spear-point knives, &c. The vessel sailed from New-York direct to the mouth of the Congo river, and soon after the arrival there, was boarded by the officers of a British vessel of war, and detained for a time as suspected of being intended for or engaged in the slave-trade; and the master, as appears by the log-book, there proposed to abandon the vessel as a prize to this British cruiser. This was opposed by the mate and crew, who declared that they were not conscious of having done anything illegal, and that if it were necessary to give up the ship, they would prefer being given up to a ship of their own nation. The mate

then sought the Marion, and the Orion was searched, and sent home for condemnation.

The counsel of the claimants contend that the articles found on board are proper articles of legal trade, and that the proofs are not sufficient to warrant the condemnation. It is true that they might be articles of legal trade, but all the circumstances are suspicious. The almost entire change of crew on the 20th of January; the character of the cargo, apparently selected with a view to the traffic of slaves, or to be used as provisions for them; the extraordinary quantity of water-casks under cover of their being intended for palm-oil, though the vessel was apparently seeking a part of the country where the trade is not in palm oil; the antecedents of the supercargo sent with the vessel, who was a Portuguese, who by his own account, had had previous experience both on the coast of Africa and at Rio Janeiro; the sailing of this small vessel under a charter-party at $850 per month with but one-third or one-half of the cargo; and other circumstances convince us she was intended and fitted out for the slave-trade. The ordering of the casks of Vining, the owner, though shipped as part of the cargo owned by Miranda, the charterer, is, perhaps, not a fact of much significance, but the copper boilers which were tinned inside, and were certainly well calculated for use as the coppers of a slave vessel, is quite significant. It is true they were ordered to be made under the names of rum-stills and caps, but there does not appear to be much, or indeed any reason to suppose they were intended for any such purpose. For that purpose worms were necessary to be added, and as none were ordered with them, the manufacturer called Miranda's attention to the fact, and was told by Miranda that he had the worms for them. No worms were shipped with them, no evidence was given that there were any owned by Miranda, and I cannot but think that the calling of these boilers rumstills, and having them made in the form of a French still, and the statement to the manufacturer that he had the worms for them, was only intended to cover up the real motive in procuring them.

The exculpatory evidence is not of much weight, unless credit is given to the testimony of Canhao, the supercargo, who put in, as agent, the claim of Miranda for the cargo, and whose deposition was read upon the hearing. The deposition of the mate, if entirely reliable, is not of much importance, as Canhao was undoubtedly the person to whom the real object of the voyage was best known, and probably Canhao and the master were the only persons who knew that the vessel was intended to be employed in the slave-trade, if such was the fact. Canhao's testimony is not, in my judgment, to be relied upon. If he had been produced and examined and cross-examined in court, I might have received a different impression, but I do not think his testimony is sufficient to exonerate the vessel, and cargo, especially as Vining and Miranda, each of whom was a competent witness in respect to the property claimed by the other, have not been produced or offered as witnesses, and Miranda did not demur to the answer put in in his behalf by Canhao.

I am of the opinion, therefore, that there must be a decree of condemnation with costs.